IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOHN BOREMAN,

    Plaintiff,

v.                                                       Civil Action No. 5:07CV155
                                                                               (STAMP)
UNITED STATES OF AMERICA,

    Defendant.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### I. Procedural History

John Boreman ("Mr. Boreman") filed this civil action against defendant United States of America ("United States") under 28 U.S.C. § 1346(b)(1), the Federal Tort Claims Act, to recover damages for injuries he alleges he sustained when he fell on December 14, 2004 inside the McMechen Post Office located at 717 Marshall Street, McMechen, West Virginia ("the Post Office"). Mr. Boreman alleges that the defendant United States was negligent in its maintaining the floor of the Post Office at that time and place by permitting the floor to become wet and slippery which condition resulted in Mr. Boreman's fall and his alleged injuries and damages.

On March 24, 2009, the Court conducted a non-jury trial on the allegations of liability contained in the complaint. By agreement of the parties, the Court deferred hearing any evidence on damages until this Court had ruled on the issue of liability.

Based upon this Court's review of the evidence, upon the resolution of factual disputes after giving due consideration to both the credibility of the witnesses and the various documents, this Court pursuant to Federal Rule of Civil Procedure 52(a), hereby makes the following findings of fact and conclusions of law and finds that the defendant United States is entitled to judgment and that, therefore, this civil action shall be dismissed.

## II. Findings of Fact

1. At the time of his fall, plaintiff Boreman was 60 years of age. He is Vietnam veteran and has had health problems preexisting the fall at the McMechen Post Office, which health problems included diabetes and a heart condition. Further, Mr. Boreman had an amputation of one of his legs performed in 1998 or 1999 and had a prosthesis which he was wearing at the time of his fall. Mr. Boreman had apparently been wearing this particular prosthesis for about one year prior to the fall.

2. Mr. Boreman, who resides in the town of McMechen, went to the McMechen Post Office to purchase postage stamps along with Pittsburgh Steelers items. Mr. Boreman drove himself to the McMechen Post Office and parked near the front of the Post Office building. The Post Office building at 717 Marshall Street, McMechen, West Virginia was leased by and was under the control of the United States Postal Service.

3. There was a ramp leading from the sidewalk in front of the Post Office to a glass door providing access to a foyer inside the Post Office.

4. In the foyer, there was an area rug that one crossed in order to get to a single glass door leading into the Post Office lobby.

5. Inside the single glass door leading from the foyer into the Post Office lobby there was a second area rug that one walked over in order to proceed into the lobby. The lobby floor was vinyl tile. Also in the lobby were various tables, displays, equipment and a counter service window.

6. The above-described area rugs had rubber backing securing them to the floor.

7. Various photographs were introduced at the trial which showed the sidewalk and front entrance, the Post Office foyer and the Post Office lobby.

8. Testimony varied somewhat as to the weather conditions outside the Post Office both on the day and the day of Mr. Boreman's fall. There was testimony that there was a light snow with no accumulation on the street or sidewalk. However, Tracey Boreman, Mr. Boreman's daughter, who was a the Post Office sometime before Mr. Boreman's fall and after his fall, testified that the area outside the Post Office on the day of the fall was "slushy."

9. Mr. Boreman testified that it had snowed prior to the day he fell and that there was some slush on the streets and sidewalks.

10. Mr. Boreman testified that he walked up the Post Office ramp, went through the first set of doors and then went through the second set of doors and at that time fell.

11. Mr. Boreman testified that he noticed that the floor was wet. He said that the rug inside the foyer was "like a sponge" and that he took perhaps one step and then "went diving." At trial, he testified that his legs went out from under him and he fell down.

12. Mr. Boreman testified that he was careful about walking over the rug and was wearing shoes with rubber soles.

13. Mr. Boreman said that he was not dizzy at the time that he walked into the Post Office and into the lobby or at the time that he fell and that he was walking without difficulty.

14. Mr. Boreman testified that before he fell, he saw wet spots on the rug. He testified that he might have been a foot or half a foot away from the rug in the lobby at the time that he fell. Mr. Boreman also testified that after his fall, he told medical personnel who came to the Post Office that he fell because there was a wet spot on the floor.

15. However, during his deposition taken prior to the trial, Mr. Boreman testified that he had no independent recollection of slipping on water or snow on the floor of the lobby of the Post Office and that he had no independent recollection of water or snow

being on the lobby floor at the time of his fall.  Further, Mr. Boreman testified at his deposition that he did not remember if he slipped on water on the lobby floor because he did not consider himself to be prone to falling.

16. At trial, when confronted with this seeming discrepancy in his trial testimony and his pretrial deposition testimony, Mr. Boreman said he remembered what actually happened after his deposition.  As Mr. Boreman testified at trial:  "Let's say I had amnesia in that period of time from the fall and that I started thinking about it."

17. The other witness testifying for Mr. Boreman in addition to the plaintiff himself was Mr. Boreman's daughter, Tracey E. Boreman.

18. While Tracey Boreman was not in the Post Office at the time her father, John Boreman, fell on December 14, she was in the Post Office between 12:00 p.m. and 1:00 p.m. on the day of her father's fall to purchase stamps for her place of employment, a child care facility known as "The Honey Pot."  She was also at the Post Office after plaintiff Boreman's fall arriving in response to a call from the Post Office personnel after her father had fallen. Consequently, she was not in or near the McMechen Post Office when her father entered the facility and fell on December 14, and testified that she did not know the condition of the Post Office

lobby at the moment her father entered it on December 14 and at the time of his fall.

19. Tracey Boreman testified that when she was at the Post Office several hours before her father entered the facility, the floor was wet and slippery and the area rug was "saturated" with water. She also testified that at that time and prior to the accident, the sidewalk in front of the Post Office was covered with "slush."

20. When Tracey Boreman was at the Post Office before her father's accident, she approached the service window and spoke with a Post Office employee but did not mention to him either the condition of the sidewalk or the condition of the lobby. Ms. Boreman testified that when she was at the Post Office several hours before her father's fall: "I slipped myself." She said that at that time the floor was wet and the rug was wet. She was, however, able to catch herself and did not fall.

21. Tracey Boreman testified that she returned later to the Post Office after having been notified by personnel that her father had fallen. She testified that at that time the lobby floor was wet and that she saw that her father's pants had become wet.

22. The defendant United States presented the testimony of Patricia E. Rutan, the Postmaster at the McMechen Post Office, Nancy A. Pickens, an independent contractor hired by the Postal Service to clean the McMechen Post Office several times a week and

Kerry W. Welsh and Edward A. Eakle, two letter carriers who were on duty in and out of the McMechen Post Office on the day of the accident.

23. Ms. Rutan first identified eight photographs (Gov't's Exs. 1 through 8) of the Post Office, specifically the foyer, the ramp in front of the Post Office, the front of the Post Office, and the Post Office lobby. These photographs were taken by Ms. Rutan on December 15, the day after the accident. The rugs depicted in the exhibits were the same ones in place on the day of the accident. These exhibits were admitted.

24. Ms. Rutan testified that the sidewalk in front of the Post Office was slightly damp and was not slushy on December 14. She further testified that the photographs of the sidewalk in front of the Post Office that she took on December 15, the day following the accident, accurately depicted the condition of the sidewalk as it existed on December 14. This testimony was corroborated by Ms. Pickens.

25. Ms. Rutan testified that on December 14 she was the person ultimately responsible for maintaining the lobby at the McMechen Post Office and would normally be in the lobby of the Post Office around the date of the accident about four or five times a day and would have observed the area from behind the service counter window about 35 to 45 times a day.

26. Ms. Rutan testified that if she had observed a problem on December 14, 2004 with the lobby floor having a substance on the floor, she would have taken care of it immediately, whether it be a wet floor or wet carpeting on the floor.

27. Shortly after 3:28 p.m. on December 14, when Mr. Boreman entered the Post Office, Postmaster Rutan testified that she heard a loud noise in the lobby. She was at that time at her desk behind a closed door that separated the lobby from the work area. She testified that she followed letter carriers Eakle and Welsh to the lobby and at that time saw plaintiff Boreman lying on the floor and that it looked like he had fallen (a circle on a photographic exhibit made by Ms. Rutan shows the general area where Mr. Boreman was laying).

28. When Ms. Rutan and the letter carriers approached Mr. Boreman, he was the only person present in the lobby.

29. The letter carriers, who preceded Ms. Rutan into the lobby, assisted Mr. Boreman.

30. At that time, Ms. Rutan testified that she saw no tripping hazard or debris of any kind on the floor that may have caused the fall. She testified that there was no water present on the vinyl floor or slush, snow or foreign substance of any kind. Ms. Rutan testified that she observed that Mr. Boreman's pants were dry. She saw no water on the floor at that time. The rug where

Mr. Boreman fell was, according to Ms. Rutan, laying flat and was dry.

At the request of Mr. Boreman, Ms. Rutan called Mr. Boreman's daughter, Tracey Boreman, and left a message to tell Ms. Boreman about her father's fall.

31. Ms. Rutan believes that the Emergency Medical Services ("EMS") personnel arrived before Ms. Boreman arrived. After Mr. Boreman was removed by the EMS, Ms. Rutan again observed the area where Mr. Boreman had been lying and at that time did not see any debris, water or foreign substance on the floor.

32. Ms. Rutan acknowledged that when a hard surface floor is wet or moist this could create a hazard and that, in addition, when a rug at the entrance is wet or moist this could create a hazard or potential hazard, as well. Ms. Rutan disagrees with the testimony of plaintiff Boreman and his daughter that the rug was wet indicating that she felt the rug at the entrance with her hand and that there was no moisture at that time.

33. Ms. Rutan acknowledged that there was no documentation as to whether or not the floor had been inspected between the time the cleaning person left the premises and the time that Mr. Boreman fell. Ms. Pickens, the person contracted by the Postal Service to clean the McMechen Post Office, testified that she was the cleaning person at the McMechen Post Office in December 2004. Ms. Pickens testified that she started her cleaning of the McMechen Post Office

9

at approximately 1:00 p.m. on December 14 and finished her cleaning at approximately 2:30 p.m. on that day.  This would mean that Ms. Pickens completed her cleaning and left the McMechen Post Office less than one hour before Mr. Boreman entered the Post Office and fell on the Post Office lobby floor.

    34.  Ms. Pickens testified that she dry mopped the lobby floor on December 14 and detected no water at that time.  She testified that the lobby floor at that time was dry.  She also testified that she vacuumed the area rugs in the foyer and lobby of the Post Office on that date and that the rugs were lying flat and were dry.  The day of the accident, a Tuesday, was a day on which Ms. Pickens would dry mop the lobby area.  Ms. Pickens testified that when she completed her cleaning on December 14, the vinyl floor area was dry.  Ms. Pickens' contract with the Postal Service ended in February 2005.  She left her employment on good terms, resigning because of the travel distance from her home to McMechen.

    35.  Kerry W. Welsh, one of the letter carriers on duty on the day of the accident, testified that after he returned from his route on that day, he was in the workroom and heard a noise and knew that someone had fallen.  He indicated that Mr. Boreman fell at about 3:20 p.m.  Mr. Welsh left the work area and went directly to Mr. Boreman, who was lying on the floor.  All of this was accomplished within seconds after hearing the noise.  Mr. Welsh testified, as did Ms. Rutan, that Mr. Boreman was at that time the

only person in the lobby of the Post Office. Mr. Welsh testified that while assisting Mr. Boreman, he looked at the floor. According to Mr. Welsh, there were no tripping hazard or any debris, slush or snow. Mr. Welsh saw no foreign substance of any kind on the floor. Mr. Welsh acknowledged that Mr. Boreman at the time of the fall had said that he had slipped on some water.

36. The other letter carrier on duty at that time was Edward L. Eakle, who testified that he finished his route and came back to the McMechen Post Office on December 14 at approximately 3:15 p.m. He was also back in the workroom when he heard a noise and went to the front lobby to find Mr. Boreman on the floor of the lobby. It was evident at that time that Mr. Boreman had fallen. Mr. Eakle also testified that at that time while assisting Mr. Boreman he observed the floor area around Mr. Boreman and saw no tripping hazards, debris, water, dampness, slush, snow or any other foreign substance on the floor. Mr. Eakle indicated that he asked Mr. Boreman if his leg had given out on him and Mr. Boreman responded that it had. Both Mr. Eakle and Mr. Welsh testified that on December 14 they walked over the same area where Mr. Boreman had fallen. Mr. Eakle walked over the area where Mr. Boreman fell, a short time before Mr. Boreman fell and there were "no problems or issues" with the lobby at that time.

37. During the trial, this Court heard argument by counsel concerning the admissibility of Plaintiff's Exhibit Nos. 9, 10, 11,

11

12, 13, 15, 17 and 19, which were various medical records of Mr. Boreman from Wheeling Hospital beginning July 2002 through September 2004, prior to the December 14, 2004 fall at the Post Office, which records in part document certain "dizziness" at the time of such treatment. These exhibits were primarily offered by the defendant to show that Mr. Boreman had a propensity or tendency to fall and that this would serve as a reasonable alternative explanation for his fall. The Court heard argument on the admissibility of these exhibits at the pretrial conference and at the conclusion of the trial. The parties provided no further memoranda concerning those exhibits. This Court has again reviewed those exhibits and believes that, under the particular circumstances in this case, these exhibits are not relevant to this Court's finding of liability, that is, whether the defendant breached its duty of care to the plaintiff at the time of the accident. Accordingly, those exhibits will not be admitted.

38. This Court, as the factfinder in a non-jury trial, must judge the credibility of all of the witnesses and the weight their testimony deserves. While this Court has no reason to doubt the credibility of any witness who testified at the trial, nevertheless, this Court must note certain inconsistencies and discrepancies between the testimony of different witnesses. Judges often instruct trial juries that many times two or more persons witnessing an incident may see it or hear it differently, and

innocent misrecollection like failure of recollection is not an uncommon experience. After reviewing all the testimony, this Court must, however, note the inconsistency between Mr. Boreman's deposition testimony and his trial testimony concerning the fall that he sustained and the condition of the Post Office lobby floor at the time of the incident. This Court must also note the testimony of the Post Office employees and the cleaning person, Nancy Pickens, who saw the lobby area a short time before and after Mr. Boreman's fall.

39. Any finding made by this Court which is not a finding of fact shall be deemed a conclusion of law.

### III. Conclusions of Law

1. Under the Federal Tort Claims Act, the United States may be held liable in tort "in the same respect as a private person would be liable under the law of the place where the act occurred." Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001).

2. Landowners or possessors owe any non-trespassing entrant a duty of reasonable care under the circumstances. Syl. Pt. 4 Mallet v. Pickens, 206 W. Va. 145, 522 S.E.2d 436 (1999).

3. "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to

result." Syl. Pt. 5, Mallet v. Pickens, 206 W. Va. 145, 522 S.E.2d 436 (1999).

4. "A trespasser is one who goes upon the property or premises of another without invitation, express or implied, and does so out of curiosity, or for his own purpose or convenience, and not in the performance of any duty to the owner." Syl. Pt. 7, Mallet v. Pickens, 206 W. Va. 145, 522 S.E.2d 436 (1999).

5. "An 'invitation' occurs when a possessor of certain premises exhibits conduct which makes others believe the possessor wants them to be on the premises." Cole v. Fairchild, 198 W. Va. 736, 742, 482 S.E.2d 913, 919 (1996).

6. "An invitation is the act of one who solicits or incites others to enter upon, remain in, or make use of, his property or structures thereon, or who so arranges the property or the means of access to it or of transit over it as to induce the reasonable belief that he expects or intends that others shall come upon it or pass over it." Cole v. Fairchild, 198 W. Va. 736, 482 S.E.2d 913, 919 (1996) (quoting Waddell v. New River Co., 141 W. Va. 880, 883, 93 S.E.2d 473, 476 (1956)).

7. "An invitation is implied when premises of an owner or an occupant are entered or used for a purpose which is beneficial to the owner or the occupant, or when the entry or the use is for the mutual benefit of the owner or the occupant and the entrant or the

user of the premises." Syl. Pt. 1, <u>Puffer v. Hub Cigar Store</u>, 140 W. Va. 327, 84 S.E.2d 145 (1954).

    8. "The owner or occupant of premises owes to an invited person the duty to exercise ordinary care to keep and maintain the premises in a reasonably safe condition. This duty requires the owner or the occupant of premises to exercise ordinary care to protect an invited person from injury inflicted by other persons present on such premises; and if such owner or occupant fails to perform such duty and his negligence is the proximate cause of injuries inflicted upon an invited person by another person such owner or occupant is liable to such invited person." Syl. Pt. 9, <u>Louk v. Isuzu Motors, Inc.</u>, 198 W. Va. 250, 479 S.E.2d 911 (1996); Syl. Pt. 4, <u>Puffer v. Hub Cigar Store</u>, 140 W. Va. 327, 84 S.E.2d 145 (1954).

    9. "In determining whether a defendant in a premises liability case met his or her burden of reasonable care under the circumstances to all non-trespassing entrants, the trier of fact must consider (1) the foreseeability that an injury might occur; (2) the severity of injury; (3) the time, manner and circumstances under which the injured party entered the premises; (4) the normal or expected use made of the premises; and (5) the magnitude of the burden placed upon the defendant to guard against injury." Syl. Pt. 6, <u>Mallet v. Pickens</u>, 206 W. Va. 145, 522 S.E.2d 436 (1999).

10. "While the proprietor of a place of business is not an insurer of the safety of his patrons, [he] does impliedly warrant that the premises are reasonably safe." Curry v. Hecks, Inc., 157 W. Va. 719, 722, 203 S.E.2d 696, 698 (1974).

11. "The degree of care required of [an owner] is the care which an ordinarily prudent man would exercise under like circumstances." Curry v. Hecks, Inc., 157 W. Va. 719, 722, 203 S.E.2d 696, 698 (1974).

12. ". . . if a foreign object on the floor renders an ordinarily safe condition unsafe, the proprietor's liability depends upon whether he knew or had a reasonable opportunity to discover the unsafe condition." Curry v. Hecks, Inc., 157 W. Va. 719, 722, 203 S.E.2d 696, 698 (1974).

13. The plaintiff has to show that the defendant knew, or by the exercise of reasonable care should have known of the wet or slippery condition of the floor in the lobby of the McMechen Post Office. Curry v. Hecks, Inc., 157 W. Va. 719, 722, 203 S.E.2d 696, 698 (1974); Syl. Pt. 2, Adkins v. Chevron, USA, Inc., 199 W. Va. 518, 485 S.E.2d 687 (19997).

14. "Failure to take precautionary measures to prevent an injury which if taken would have prevented the injury is not negligence if the injury could not reasonably ha[v]e been anticipated and would not have happened if unusual circumstances

16

had not occurred." Puffer v. Hub Cigar Store, 140 W. Va. 327, 336, 84 S.E.2d 145, 153 (1954).

15. "A plaintiff is not barred from recovery by the doctrine of assumption of risk unless his degree of fault arising therefrom equals or exceeds the combined fault or negligence of the other parties to the accident." Syl. Pt. 2, King. v. Kayak Mfg. Corp., 182 W. Va. 276, 387 S.E.2d 511 (1989).

16. "The predicate of assumption of risk is that the plaintiff has full knowledge and appreciation of the dangerous condition and voluntarily exposes himself to it." King v. Kayak Mfg. Corp., 182 W. Va. 276, 282, 387 S.E.2d 511, 517 (1989).

17. The plaintiff John Boreman is not required to prove that the defendant was one hundred percent responsible for the fall. Syl. Pt. 2, Mays v. Chang, 213 W. Va. 220, 579 S.E.2d 561 (2003) (quoting Syl. Pt. 2, Everly v. Columbia Gas of W. Va., Inc., 171 W. Va. 534, 301 S.E.2d 165 (1982)). "A party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of an injury." Divita v. Atlantic Trucking Co., 129 W. Va. 267, 40 S.E.2d 324 (1946), is overruled to the extent it states a contrary rule." Syl. Pt. 2, Mays v. Chang, 213 W. Va. 220, 579 S.E.2d 561 (2003) (quoting Syl. Pt. 2, Everly v. Columbia Gas of W. Va., Inc., 171 W. Va. 534, 301 S.E.2d 165 (1982)). "A party is not barred from recovering damages in tort action so long as his negligence or fault does not equal or

exceed the combined negligence or fault of the other parties involved in the accident." Syl. Pt. 3, <u>Bradley v. Appalachian Power Co.</u>, 163 W. Va. 332, 256 S.E.2d 879 (1979).

18. Under West Virginia law, a plaintiff who is alleged to have sustained injuries as a result of the negligence of the defendant must establish three propositions. First, the plaintiff must establish a duty which the defendant owed to him. Next, the plaintiff must establish a negligent breach of that duty. Finally, the plaintiff must demonstrate injuries received thereby resulting proximately from that breach of that duty. <u>Webb v. Brown & Williamson Tobacco Co.</u>, 121 W. Va. 115, 2 S.E.2d 898, 899 (1939).

19. In order to make a prima facie case of negligence in a slip and fall case under West Virginia law, an invitee must demonstrate that the owner had actual or constructive knowledge of the foreign substance or defective condition and that the invitee had no knowledge of the substance or condition or was prevented by the owner from discovering it. <u>McDonald v. University of West Virginia Board of Trustees</u>, 191 W. Va. 179, 182, 444 S.E.2d 57, 60 (1994). With respect to so-called slip-and-fall cases, the mere occurrence of a fall on the business premises is insufficient to prove negligence on the part of the proprietor. <u>Id.</u>

20. Based upon the above findings of fact and conclusions of law, this Court finds that the plaintiff John Boreman has failed to prove by a preponderance of the evidence that defendant United

States of America breached its duty of care to the plaintiff and, therefore, this Court finds in favor of the defendant United States of America.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED: September 24, 2009

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE